UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| EVYENIA KARAEFTIMOGLU, individually and on behalf of all others similarly situated, | Case No. 2:25-cv- |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| -against- | **1. VIOLATIONS OF SECTION 14(A) OF THE SECURIIES EXCHANGE ACT OF 1934** |
| MARK P. MADER and SMARTSHEET INC. | |
| Defendants. | **2. VIOLATIONS OF SECTION 20(A) OF THE SECURIIES EXCHANGE ACT OF 1934** |

Plaintiff Evyenia KaraEftimoglu ("Plaintiff"), through undersigned counsel, alleges upon personal knowledge with respect to herself, and, as to all other allegations herein, upon information and belief based upon the investigation of counsel and publicly-available information, as follows:

## NATURE OF THE ACTION

1.      This is a stockholder class action brought by Plaintiff on behalf of herself and all other similarly situated former stockholders of Smartsheet Inc. ("Smartsheet" or the "Company") against (1) Smartsheet and (2) Mark P. Mader ("Mader"), the Company's former President, Chief Executive Officer, and member of the Smartsheet Board of Directors (the "Board"), for violating Sections 14(e) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. 78n(e) and 78t(a), in connection with their efforts to effectuate the January 2025 sale (the "Merger"

or "Buyout") of Smartsheet to affiliates of investment funds managed by affiliates of Blackstone Inc. (collectively "Blackstone"), investment funds managed by Vista Equity Partners Management, LLC ("Vista Equity Partners" or "Vista"), and Platinum Falcon B 2018 RSC Limited, an indirect wholly owned subsidiary of the Abu Dhabi Investment Authority, which participated as an indirect minority investor in Smartsheet ("Platinum Falcon," and together with Blackstone and Vista, the "Consortium").

2.      In connection with the Company's solicitation of stockholder approval of the Buyout, Defendants issued and filed with the SEC a false and misleading Schedule 14A Proxy statement, as amended (the "Proxy").[1] As a direct result of the misleading Proxy, Smartsheet's former shareholders approved the Merger and received the unfair price of $56.50 in cash for each share of Smartsheet common stock they owned (the "Merger Consideration").

3.      Smartsheet is an enterprise software company providing software-as-a-service ("SaaS") work management solutions to small and large clients across the globe. As a SaaS company, the Company tracked its Annual Recurring Revenue ("ARR") metric, which normalized contracted recurring revenue components of its subscription services to a one-year period. Smartsheet has been recognized as an industry "Leader," and was the *first* company in the collaborative work management category to achieve $1 Billion in ARR.

4.      Smartsheet's President and CEO, Defendant Mader, served in the role since 2006, when Smartsheet had just six employees. Mader publicly described Smartsheet's early years as turbulent, necessitating management to pivot and make changes just to survive. Ultimately, Smartsheet reached the coveted unicorn status, and went public in 2018 through a $150 million IPO at a $1.5 billion valuation.

5.      As the CEO and President of a start-up turned unicorn, Mader's financial compensation had been predominantly composed of Smartsheet equity. By 2023, Mader (and other Smartsheet insiders) held tens of millions of dollars in vested and unvested equity awards, and

---

[1]      All undefined capitalized terms have the same meaning as the Proxy, and unless otherwise indicated, all emphasis added.

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

while he sold small portions of his equity pursuant to a 10b5-1 plans, Mader and his team needed a liquidity event to unlock the value of their equity. What is more, in 2023, the Board determined to revise the Company's compensation plan to establish performance-based equity awards for senior management, which performance would be tied to the Company's stock price relative to an industry index.

6.    Naturally, Smartsheet's success attracted the interest of private equity buyers, including Vista and Blackstone, who separately approached Mader in June 2023 following a drop in the Company's market value. As described herein, there is a dearth of information in the Proxy concerning the nature and particulars of the Consortium's early interactions with Mader, but Delaware courts have acknowledged that Vista, specifically, is a "pro at acquiring companies" by using its suspiciously close relationship with Qatalyst Partners LP ("Qatalyst Partners" or "Qatalyst") to influence and persuade CEOs to tilt sales processes in Vista's favor. *See generally In re Mindbody, Inc*., 2023 Del. Ch. LEXIS 65 (Del. Ch. Mar. 15, 2023), *rev'd in part*, 332 A.3d 349 (Del. 2024) (adopting the trial court's factual findings) ("*Mindbody*").

7.    Pursuant to this *modus operandi*, shortly after Vista and Blackstone's early unsupervised discussions with Mader, the Board—with multiple professional ties to Vista or Blackstone—engaged Qatalyst and a formal, conflicted, process thereafter followed, through which Vista and Blackstone were able to use their head-start and "ability to move very quickly through both business and confirmatory diligence and leverage[] [their] early analysis to truncate processes and reduce the ability for other potential acquirers to be able to complete diligence and provide certainty at the finish line[.]" *Mindbody*, 332 A.3d at 364.

8.    In January 2024, the Consortium submitted a proposal to acquire the Company for $56.25 per share; the Board determined that was too low to further engage. In March 2024, *while Vista and Blackstone were actively pursuing an acquisition of the Company*, Katie Rooney ("Rooney") was appointed to the Board; Rooney had an extensive prior professional relationship with Blackstone. Despite the obvious conflict, the Board took no steps to recuse Rooney from

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

participating in the deliberations concerning the Buyout; rather, she was appointed to the Transaction Committee (defined below) formed to streamline the process.

9.      Around the same time as Rooney was appointed, Smartsheet management "re-evaluated its key business metrics" and began guiding the market to focus on its ARR metric, which it referred to as **the best reflection of the Company's financial performance**. In each quarterly earnings report and call thereafter, the Company touted its ARR metric, which increased each quarter, ultimately causing the Company's stock price to organically rise.

10.     Meanwhile, Vista and the Consortium had been acquiring Smartsheet shares on the open market while continuing to advance talks with management. In July, the Consortium raised its proposal by *just* $0.25 per share. Ultimately, following several leaks and public reporting of the Consortium's discussions with Smartsheet, and despite the Company's financial successes and ARR achievements during that same time, the Consortium was able to leverage its influence and speed, such that the Board and management did not secure any additional value for shareholders. As noted above, the Proxy provides a hollow discussion of the interactions and process that culminated in the Buyout.

11.     What is more, and at the crux of this case, Defendants used the Proxy to intentionally mischaracterize the Company's financial success and performance during and in the context of the Company's sales process. Specifically, Defendants deliberately cast the Company's quarterly earnings in a negative light in the Proxy, and emphasized a financial metric that it apparently made up *just for the purposes of soliciting approval for the Buyout.*

12.     In the Company's contemporaneous quarterly earnings reports and calls during 2023-2024, management specifically guided the market to focus on the Company's ARR as a better metric. However, in the Proxy's discussion of each of the Company's quarterly results and the Board's deliberations over the Company's strategic alternatives, the Proxy described a "**net bookings" metric as "an indicator of future revenue performance**," despite the Company **never** previously discussing this performance indicator. This "net bookings" metric declined each quarter, and the Proxy emphasized this, giving shareholders a negative impression of the

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

Company's future revenue performance. By contrast, during the same period, management publicly touted in press releases and earnings calls the growth of the Company's ARR metric, but withheld the same positive information from the Proxy:

| DATE | ARR (not disclosed in Proxy) | Net Bookings year-over-year (from Proxy) |
|---|---|---|
| 6/7/23 | $        886,000,000 | |
| 9/7/23 | $        933,000,000 | |
| 12/7/23 | $        981,000,000 | |
| 3/14/24 | $     1,031,000,000 | -19% |
| 6/5/24 | $     1,056,000,000 | -19% |
| 9/5/24 | $     1,093,000,000 | -11% |
| 12/5/24 | $     1,133,000,000 | |

13.     As a result of the materially misleading Proxy, Smartsheet's shareholders approved the Buyout. The $56.50 per share Merger Consideration fell in the middle of Qatalyst's discounted cash flow analysis of $47.80 to $65.31 per share based on admittedly "conservative" forecasts. The Merger Consideration also fell below several analyst price targets, which had been raised following the Company's early 2024 successes.

14.     Following the Buyout, Mader retained his position as CEO and President while monetizing a portion of his equity for approximately $68 million. On August 5, 2025, Smartsheet announced that Mader was retiring, triggering the remainder of his golden parachute, but would remain with the Company as an "advisor and a 'significant investor.'"

## JURISDICTION AND VENUE

15.     This Court has original jurisdiction over this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

16.     Personal jurisdiction exists over each Defendant either because each Defendant conducted business in or maintained operations in this District, or is an individual or entity that is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over the Defendants by this Court permissible under traditional notions of fair play and substantial justice.

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

17.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as pursuant to 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Smartsheet maintained its headquarters in this District and Defendant Mader, as a Company officer and director, either resides in this District or had extensive contacts within this District; (iii) a substantial portion of the actions in furtherance of the Buyout and wrongs complained of herein occurred in this District; (iv) relevant documents pertaining to Plaintiff's claims are stored (electronically and otherwise), and evidence exists, in this District; and (v) Defendant Mader has received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

18.     Plaintiff Evyenia KaraEftimoglu was, at all relevant times, a stockholder of Smartsheet.

19.     Defendant Mark P. Mader ("Mader") has served as President and Chief Executive Officer and as a director of Smartsheet since January 2006. Since February 2020, Mader has served as a member of the board of directors of ZoomInfo Technologies Inc. ("ZoomInfo"). Mader signed the Merger Agreement on behalf of the Company and the solicitation letter attaching the Proxy "[o]n behalf of the Board." The Board designated Mader as the proxy holder for the Company Shareholders' Meeting.  Mader continued to serve as President and CEO of Smartsheet following the Buyout, and, on August 5, 2025 announced that he would retire as CEO and from the Board of Directors at the end of September 2025.

20.     Defendant Smartsheet was a Washington corporation with its principal executive offices located at 500 108th Ave NE, Suite 200, Bellevue, Washington 98004. Prior to the Buyout, Smartsheet traded on the NYSE under the symbol "SMAR." Upon consummation of the Buyout, Smartsheet merged with and into Einstein Merger Sub, Inc., a wholly owned subsidiary of Einstein Parent, Inc., a California company and affiliate of Blackstone and Vista formed for purposes of effectuating the Buyout.

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**RELEVANT NON-PARTIES**

21.     Alissa Abdullah served as a director of Smartsheet since March 2021.

22.     Geoffrey T. Barker served as a director of Smartsheet since September 2012 and served as the chair of the Board from December 2017 until March 2023.

23.     Michael Gregoire ("Gregoire") served as a director of Smartsheet since December 2019 and as Chair of the Board since March 2023.

24.     Matthew McIlwain ("McIlwain") served as a director of Smartsheet since May 2007. McIlwain served as a Managing Director at Madrona Venture Group ("Madrona"), an early investor in Smartsheet.[2] McIlwain was the chair of the Company's compensation committee.

25.     Katie Rooney ("Rooney") served as a director of Smartsheet since March 2024. Rooney previously served in a broad range of senior finance leadership roles at Aon Plc ("Aon"), where she helped lead the 2017 carve-out of Alight Solutions LLC ("Alight") from Aon to Blackstone.[3] At the time she was appointed to the Board, she served as the Global Chief Financial Officer and Chief Operating Officer at Alight; Rooney stepped down from her position at Alight in May 2025. Following the closing of the Merger, Rooney was appointed to the board of ZoomInfo, alongside Mader, effective February 1, 2025.

26.     Khozema Shipchandler ("Shipchandler") served as a director of Smartsheet since June 2023.

---

[2]     Mc Ilwain, via Madrona, was an early investor in Apptio, Inc. ("Apptio"), which was sold to Vista in 2019 for approximately $2 billion. Madrona is also invested in Clari, Inc., a privately held company in which funds managed by Blackstone are also invested.

[3]     In 2021, Blackstone and Foley Trasimene Acquisition Corp., a special purpose acquisition company ("SPAC"), took Alight public. Following the closing of that transaction, Blackstone remained actively involved in the governance and operations of Alight, including through: (i) a significant equity stake and presence on the Alight board of directors, (ii) various commercial transactions between Alight and Blackstone portfolio companies, (iii) a tax receivable agreement, and (iv) an investor rights agreement with Alight. Notably, in connection with and following the Blackstone-led Alight de-SPAC transaction, Rooney's prior equity converted and she entered into an amended employment agreement with Alight such that Rooney received an aggregate of approximately $22.5 million in stock during fiscal 2021. On September 1, 2023, Blackstone withdrew from its investor rights agreement with Alight and began liquidating its stake.

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

27.    Rowan Trollope served as a director of Smartsheet since September 2020.

28.    James N. White ("White") served as a director of Smartsheet since May 2014. From 2000 until his retirement in December 2020, White served as a Managing Director at Sutter Hill Ventures ("Sutter Hill"), an early investor in Smartsheet.[4]

29.    Magdalena Yesil ("Yesil") served as a director of Smartsheet since July 2017.[5]

30.    Along with Defendant Mader, the non-party individuals identified in paragraphs 21-29 are collectively referred to as the "Board."

## SUBSTANTIVE ALLEGATIONS

### A.    RELEVANT CORPORATE BACKGROUND

31.    Smartsheet is a software as a service (SaaS) company that offers product solutions for managing and automating collaborative work. The Company was founded in 2005 shortly after co-founder Brent Frei sold his prior co-founded company, Onyx Software Corporation ("Onyx"). Mader, who served in various leadership positions at Onyx until its sale, joined Smartsheet in January 2006 as President and CEO.

32.    Through 2017, the Company raised approximately $121 million in private funding, including significant investment from Madrona, Insight Venture Partners, and Sutter Hill.

33.    The Company completed its initial public offering and began trading on the NYSE in April 2018.

34.    Small and large companies across the world, including a majority of Fortune 100 companies, use Smartsheet's platform as their work management system. As discussed herein, Smartsheet has received numerous accolades for its work management platform, including having been recognized as a "Leader" in the Gartner Magic Quadrant for Collaborative Work Management for two consecutive years.

---

[4]    Sutter Hill has co-invested in at least two companies with Vista: Vista led a financing round for Menlo Security, Inc. (in 2020) and for Return Path, Inc. (in 2014), both in which Sutter Hill was an existing investor. In July 2025, Sutter Hill led a Series C financing round for startup Observe, Inc., with participation from Madrona (of which McIlwain was the managing director).
[5]    In 2021, Yesil coinvested in Carbon Health's Series B financing round led by Blackstone.

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

35.     Generally, the Company's executive compensation program included base salaries, short-term performance-based annual incentives, and long-term equity incentives consisting of time-based RSU awards and stock options. With respect to Mader in particular, the vast majority of his compensation was in equity, as demonstrated by the following graphic from the Company's May 2022 annual proxy statement for fiscal year ended January 31, 2022:



36.     During the fiscal year ended January 31, 2023, and in response to shareholder "preference for performance-based equity grants," the compensation committee made meaningful revisions to the Company's executive compensation program, including "establishing a new PSU program and granting initial PSU awards to further align executive compensation with Company performance and shareholder returns; [and] reducing the percentage of stock options granted to executive officers as a mix of overall long-term equity incentive compensation in order to place more focus on performance-based equity grants[.]"

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

37.    As a result, a significant portion of Mader's compensation became payable in PSUs, as disclosed in the Company's May 2023 annual proxy statement:



38.    The new PSUs were tied to a performance metric based on relative total shareholder return ("TSR") measured against the S&P Software & Services Select Industry Index over a multi-year period, such that the PSUs "establish[ed] a direct link between stock price performance and the compensation of [Smartsheet's] executive officers."

39.    The Company's executive officers did not have "automatic 'single trigger' change in control benefits for cash or equity awards." Rather, the Company's Change in Control Agreements with each named executive officer provided that, "upon either a termination . . . without 'cause' or a resignation . . . for 'good reason' (each as defined in the Change in Control Agreement) during the period commencing three months before a 'change in control' (as defined in the Change in Control Agreement) and ending 12 months after a change in control of the Company," entitled each officer to: (1) a lump-sum payment equal to six months of base salary or, in the case of Mader, 12 months of base salary; (2) a lump-sum payment equal to the named executive officer's annual incentive bonus for the then-current fiscal year, based on 100% of target performance and prorated for the portion of the applicable bonus year actually worked by such

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

executive prior to such termination; and (3) acceleration of 100% of the time-based vesting of each then-outstanding and unvested equity award, provided that awards subject to the satisfaction of performance criteria, if any, would accelerate if, and only to the extent, set forth in the applicable award agreement. Notably, "[i]f a change in control occur[ed] and [the] successor or acquirer refuse[d] to assume, convert, replace, or substitute the then-outstanding and unvested equity awards held by these named executive officers, then those awards w[ould] accelerate in full, except that awards subject to the satisfaction of performance criteria, if any, w[ould] accelerate if, and only to the extent, set forth in the applicable award agreement."

40.    Entering 2024, the majority of Mader's Smartsheet compensation was tied to his vested and unvested equity awards, including the PSUs granted in fiscal 2023 and 2024:

**Outstanding Equity Awards at Fiscal Year-End Table**

The following table presents, for each of the named executive officers, information regarding outstanding stock options, RSU awards, and PSU awards held as of January 31, 2024.

| | | | Option Awards | | | | Stock Awards | | | |
| | | | Number of Securities Underlying Unexercised Options (#) | | | | | | Equity Incentive Plan Awards: Number of Unearned Shares or Units of Stock That Have Not Vested (#) | Equity Incentive Plan Awards: Market or Payout Value of Shares or Units of Stock That Have Not Vested ($) |
| Name | Grant Date | Vesting Commencement Date | Exercisable | Unexercisable | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (#) | Market Value of Shares or Units of Stock Have Not Vested ($) | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Mark P. Mader | | | | | | | | | | |
| | 2/18/2015 | 1/1/2015 | 47,916 | — | 1.38 | 2/17/2025 | — | — | — | — |
| | 3/16/2017 | 2/1/2017 | 703,875 | — | 3.73 | 3/15/2027 | — | — | — | — |
| | 3/5/2018 | 2/1/2018 | 239,583 | — | 9.53 | 3/4/2028 | — | — | — | — |
| | 3/29/2019 | 2/15/2019 | 127,272 | — | 40.79 | 3/28/2029 | — | — | — | — |
| | 3/20/2020 | 2/15/2020 | 106,688 | 7,113 | 42.10 | 3/19/2030 | — | — | — | — |
| | 3/20/2020 | 2/15/2020 | — | — | — | — | 5,531 | 248,729 | — | — |
| | 3/19/2021 | 2/15/2021 | 59,197 | 26,909 | 62.56 | 3/18/2031 | — | — | — | — |
| | 3/19/2021 | 2/15/2021 | — | — | — | — | 21,684 | 975,129 | — | — |
| | 12/7/2021 | 11/15/2021 | 44,280 | 44,283 | 72.03 | 12/6/2031 | — | — | — | — |
| | 12/7/2021 | 11/15/2021 | — | — | — | — | 35,888 | 1,613,883 | — | — |
| | 12/6/2022 | 11/15/2022 | 28,051 | 56,104 | 36.09 | 12/5/2032 | — | — | — | — |
| | 12/6/2022 | 11/15/2022 | — | — | — | — | 88,683 | 3,988,075 | — | — |
| | 12/6/2022 | 12/6/2022 | — | — | — | — | — | — | 66,512 | 2,991,045 |
| | 12/12/2023 | 11/15/2023 | — | — | — | — | 97,975 | 4,405,936 | — | — |
| | 12/12/2023 | 12/12/2023 | — | — | — | — | — | — | 97,975 | 4,405,936 |

41.    As a result, and in sum, Mader was financially incentivized toward a liquidity event and, in the case of the PSUs specifically, an event that would lock-in an acceptable stock price relative to their performance metric index.

**B.    EVENTS LEADING TO THE BUYOUT**

**1.    Blackstone and Vista Target Smartsheet as Smartsheet's ARR Grows**

42.    On June 7, 2023, Smartsheet reported quarterly results, including that revenue for the quarter exceeded guidance and grew by 31% year-over-year to $219.9 million, with ARR of

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

$886 million and more than 12.8 million Smartsheet users. In the Company's earnings call, Mader remarked on the Company's "strength" with larger customers, with 59 customers expanding their Smartsheet investment by more than $100,000 and 188 companies expanding by over $50,000, and expressed optimism about fiscal 2024 as the company approached $1 billion in ARR. **These financial results were not disclosed in the Proxy.**

43.     However, despite this "over-performance in Q1," management elected to "remain conservative" with the Company's guidance. Following the earnings report, the Company's share price dropped from a closing price of $48.72 per share on June 6, 2023 to close at $38.58 on June 7, 2023.

44.     According to the Proxy, on June 12 and June 20, Mader met separately with representatives of Blackstone and Vista, respectively, to discuss "aspects of [the Smartsheet] business and strategic opportunities." The Proxy did not disclose the genesis of these unsupervised meetings, including whether the Board had approved of or authorized Mader's engagement, and Vista and Blackstone purportedly had not yet formed the Consortium at the time of these initial meetings or had discussions with each other about jointly pursuing a deal with the Company. It is also unclear whether Vista or Blackstone (or any affiliate) were shareholders of Smartsheet at the time of these meetings. Additional meetings between Mader and representatives of Vista were held in August and September 2023.[6]

45.     On September 7, 2023, Smartsheet reported quarterly financial results including that revenue for the quarter exceeded guidance and grew by 26% year-over-year to $235.6 million, and that Smartsheet ended the quarter with ARR of $933 million, up 27%, and more than 13.4 million Smartsheet users. The Company reported that 75 customers expanded their Smartsheet investment by more than $100,000, 232 companies expanded by over $50,000, and Smartsheet closed three transactions over $1 million, such that it now had 51 customers with ARR over $1 million. **These financial results were not disclosed in the Proxy.**

---

[6]     Mader likewise had an unsupervised meeting with another financial sponsor—"Party A"— in August 2023.

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

46.     Mader's unsupervised meetings inferably put a sale of the Company at play. On December 5, 2023, the Board held a meeting with members of senior management and, at the invitation of the Board for different portion of the meeting, representatives of Qatalyst and another investment bank to discuss considerations related to strategic transactions in Smartsheet's industry.

47.     Qatalyst is a curiously common participant on the target side of Vista deals and has a known history of conflicted negotiations in private equity buyouts. Chancellor McCormick of the Delaware Chancery recently highlighted Qatalyst's "close relationship" with Vista, specifically noting Qatalyst's "experience on deals with Vista" and that, in at least one case, Qatalyst gave Vista an "informational advantage" and leaked to Vista the target's price expectations. *See Mindbody,* 2023 Del. Ch. LEXIS 65, at *2, *55, *59, *95 (Del. Ch. Mar. 15, 2023) (highlighting that Qatalyst's 2018 pitch materials "emphasized its experience on deals with Vista."); 332 A.3d 349 (adopting the trial court's findings of fact).[7] The Proxy downplayed that relationship:

> During the two-year period prior to the date of Qatalyst Partners' opinion, no material relationship existed between Qatalyst Partners or any of its affiliates and Smartsheet, Parent, Blackstone, Vista Equity Partners, or Platinum Falcon, pursuant to which compensation was received by Qatalyst Partners or its affiliates, except that Qatalyst Partners has provided financial advisory services to (i) Cvent Inc., a then-majority-owned portfolio company of Vista Equity Partners, an affiliate of Parent, and received approximately $49 million in connection with such services, and (ii) Apptio Inc., a then-majority-owned portfolio company of Vista Equity Partners, an affiliate of Parent, and received approximately $7.5 million in connection with such services.

48.     Apropos of the early unsupervised—and perhaps unauthorized—interactions between Mader and representatives of Blackstone and Vista discussed above, the *Mindbody* opinion highlighted several interactions between the Mindbody CEO and Vista before Mindbody launched its formal process, which early meetings, combined with promised financial incentives, caused that CEO to favor a transaction with Vista.

---

[7]     Chancellor McCormick's decision has been characterized as "a detailed window into how private equity firms can prey on the neuroses of chief executives" and further exposes the "dark arts of cut-throat M&A" "in the hypercompetitive world of leveraged buyouts." *See* Sujeet Indap, *Delaware decision shows how private equity preys on vulnerable CEOs*, Financial Times (Apr. 9, 2023).

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

49.     On December 7, 2023, Smartsheet reported quarterly financial results including that revenue for the quarter exceeded guidance and grew by 23% year-over-year to $246 million, and ARR of $981 million, 59 customers with ARR over $1 million, and more than 13.9 million Smartsheet users. **These financial results were not disclosed in the Proxy.**

50.     On January 17, 2024, the Company announced that it reached ARR of $1 billion, a "significant milestone in the [C]ompany's history," and on the heels of being named a Leader in the December 2023 Gartner® Magic Quadrant™ for Collaborative Work Management. The press release further highlighted that the Company was recognized as a Leader in two IDC reports - IDC MarketScape: Worldwide Collaborative Work Management 2023-2024 Vendor Assessment and IDC MarketScape: Worldwide Cloud Project and Portfolio Management 2023-2024 Vendor Assessment. The Company was the *first* in the collaborative work management category to achieve $1 Billion in ARR. Mader described the milestone as "meaningful, but at the same time should be recognized as another marker along the way." **This significant and meaningful milestone was not disclosed in the Proxy.**

51.     On January 21, 2024, representatives of the Consortium—apparently now collaborating—called Mader and stated that Vista and Blackstone were both very interested in acquiring the Company and to expect a written proposal from them.[8]

52.     On January 23, 2024, the Board met with representatives from Qatalyst and Fenwick & West LLP, Smartsheet's outside legal counsel ("Fenwick"), to discuss the Company's potential strategic alternatives.

53.     On January 24, 2024, the Consortium submitted a non-binding indication of interest to acquire all of the outstanding shares of Smartsheet common stock for $56.25 per share in cash

---

[8]     "Vista is a pro at acquiring companies" and "[their] advantage is speed," choosing "to engage in significant background work and [be] pro-active in making friendly unsolicited approaches." *See Mindbody,* 2023 Del. Ch. LEXIS 65, at *34 (Del. Ch. Mar. 15, 2023) (internal quotations and punctuation omitted). "Vista then capitalizes on its ability to move very quickly through both business and confirmatory diligence and leverages its early analysis to truncate processes and reduce the ability for other potential acquirers to be able to complete diligence and provide certainty at the finish line." *Id.* Vista calls this "Sprinting." *Id.*

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

(the "January 24 Proposal"). The closing price of the Company's stock on the NYSE was $46.41 on this day.

54.    The Board met the next day on January 25. During the meeting, the Board and members of senior management reviewed a forecast of Smartsheet's financial results through fiscal year 2027, which had been prepared by management in the ordinary course of business (the "January 2024 Forecasts"), and discussed opportunities and risks in executing the plan as an independent company. The Board also discussed organizational changes and changes in the Company's pricing and packaging model that had not yet been publicly announced, the anticipated timing for the transition of existing business to this new model and the potential effect of these pending announcements on investors' perceptions of the Company.

55.    Following discussion, the Board determined to reject the January 24 Proposal and instructed representatives of Qatalyst to inform representatives of the Consortium that the January 24 Proposal was not sufficient for the Company to engage in further discussions at that time.

56.    Undeterred, on February 2, 2024, a representative of Blackstone called Mader to reiterate Blackstone's continued interest in the Company. Despite the Board's expressed intent not to engage with the Consortium, Mader continued to hold unsupervised discussions with Blackstone and Vista.

**2.    Smartsheet's ARR is the Company's "Key" Financial Metric**

57.    On March 14, 2024, after the close of trading on the NYSE, the Company announced its financial results for the fourth quarter of fiscal 2024.[9] **According to the Proxy**, the Company announced "revenue, operating income, free cash flow, and net income above analyst consensus estimates, but guid[ed] first quarter 2025 revenue below analyst consensus estimates." The Proxy continued:

> **While fourth quarter 2024 year-over-year revenue growth was 21%, net bookings (an indicator of future revenue performance, which we define as gross bookings from new and returning customers and expansion from**

---

[9]    The Company's fiscal 2024 consisted of the 12 months ending on January 31, 2024. Accordingly, its fiscal year 2025 began on February 1, 2024.

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

**existing customers, less churn and contraction) declined by 19% year-over-year.** We also announced changes to our executive leadership team, including the hiring of a new President, GTM and upcoming departures of our Chief Revenue Officer and Chief Marketing Officer. The next day, the closing price for shares of our common stock on the NYSE was $37.52, a 7% decline over the prior trading day.

58.     In stark contrast to the Proxy's negative tone, the press release announcing these financial results emphatically quoted Mader as stating that "[s]trong demand from [Smartsheet's] enterprise customers helped [the Company] achieve the major milestone of $1 billion in [ARR] in Q4." The Company reported $1.031 billion ARR, up 21% year over year. Mader further commented that the Company was "setting the foundation for the next era of profitable growth[.]" **These positive performance metrics were not disclosed in the Proxy.**

59.     Indeed, the press release did not even use the term "net bookings." Rather, the press release heavily referenced the ARR financial metric, noting that in the quarter, "management <u>re-evaluated its key business metrics</u> and as a result annualized contract value ('ACV') w[ould] now be referred to as [ARR]," which change would "**result in key business metrics that more closely align with [Smartsheet's] industry peers and with how management views growth in the business and evaluates financial performance**."

60.     In the accompanying earnings call, non-party Pete Godbole ("Godbole")—the Company's CFO and Mader's direct subordinate—again recentered the Company's performance around this ARR metric: "in response to investor feedback, **going forward we will be disclosing and guiding to annualized recurring revenue or ARR rather than billings. ARR provides a better reflection of [Smartsheet's] quarterly net bookings performance.**"[10] Godbole guided the market to "expect [Smartsheet's] FY'25 ARR growth to be 14% . . . [and] FY'25 free cash flow to be $200 million." **The shift to the ARR metric was not disclosed in the Proxy.**

---

[10]     The Company's Form 10-K defined ARR as "the annualized recurring value of all active subscription contracts at the end of a reporting period" excluding non-recurring revenue streams, and stated that ARR was used "to assess the strength of the Company's subscription services."

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 3.  **Vista Acquires Smartsheet Stock as the Company's ARR Continues to Grow**

61.    On March 22, 2024, the Company announced that Rooney had been appointed to the Board. As noted, Rooney had a recent significant professional relationship with Blackstone through Alight.

62.    The Company's press release highlighted that "Smartsheet is entering its next phase of growth after recently becoming the first company in the Collaborative Work Management industry to reach $1 billion in [ARR]." The press release further announced that, coinciding with Rooney's appointment, Smartsheet co-founder Brent Frei and Elena Gomez were retiring from the Board, effective June 18, 2024.

63.    On March 25, 2024, a representative of Kirkland & Ellis LLP ("Kirkland"), outside counsel to Vista, notified the Company that Vista had begun acquiring shares on the open market.

64.    On April 19, 2024, the Company announced that the Board authorized the repurchase of up to $150 million of the Company's outstanding common stock (the "Share Repurchase Program"), under which the Company would repurchase stock "from time to time through open market purchases, in privately negotiated transactions, or by other means."

65.    On May 15, 2024, Vista filed a Form 13F filing indicating that it had increased its stake in the Company from 363,271 shares to 2,122,800 shares, or to approximately 1.5% of Smartsheet's shares outstanding. According to the Proxy, "[t]his accumulation was noted by market analysts."

66.    On June 5, 2024, after the close of trading on the NYSE, the Company announced its financial results for the first quarter of fiscal 2025. **According to the Proxy**, Smartsheet

> announced significant changes in our pricing and packaging model. We also disclosed that our company delivered revenue, operating income, free cash flow, and net income above analyst consensus estimates and guiding second quarter 2025 revenue approximately in-line with analyst consensus estimates. While first quarter 2025 year-over-year revenue growth was 20%, **net bookings (an indicator of future revenue performance) again declined 19% year-over-year**. The next day, the price for shares of our common stock on the NYSE increased by 17%, closing at $44.27.

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

67.     Meanwhile, in the press release and earnings call, **management touted the Company's ARR**, which had increased to $1.056 billion, 19% year over year, causing management to raise 2025 ARR growth guidance. Mader similarly commented that the Company "delivered a strong finish to Q1, making steady progress throughout the quarter," and noted that Smartsheet "continue[d] to see significant demand from [its] enterprise customers and now ha[d] 72 customers with annualized recurring revenue over $1 million, an increase of 50% year over year." Mader concluded that "the combination of new product innovations, the upcoming launch of [Smartsheet's] modern pricing and packaging model, and a reinvigorated go-to-market strategy position[ed the Company] for long-term, durable growth." **These positive ARR performance metrics were not disclosed in the Proxy.**

68.     The press release again did not discuss "net bookings" as "an indicator of future revenue performance." Rather, in the accompanying earnings call, Godbole again **confirmed that ARR was "a much better metric"** because "billings is impacted by pro-rated bookings and the associated renewal dates that go with it." Accordingly, management **"shifted to providing guidance on ARR."**

69.     Mader further commented, "[w]e continue to see significant demand from our enterprise customers and now have 72 customers with annualized recurring revenue over $1 million, an increase of 50% year over year" and "believe the combination of new product innovations, the upcoming launch of our modern pricing and packaging model, and a reinvigorated go-to-market strategy positions us for long-term, durable growth."

70.     Notably, Godbole also stated that it expected to commence the Share Repurchase Program "within the next few days," and, when questioned on the "pretty significant" scope of the program and Company's capital allocation strategy, Godbole commented on "**how undervalued the stock was**," and that management "balance[d] that against having a healthy balance sheet for our customers and then being able to trade-off against opportunities [Smartsheet] would have in M&A and the ability to invest in M&A."

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

71.     In response to the news, many analysts raised their price target for the Company. Needham & Company maintained its Buy rating and $57 per share price target.

**4.   Mader Sets His Sights on a Sale to the Consortium and the Board Forms a Conflicted Transaction Committee**

72.     On June 24, 2024, Mader—alone—had dinner with representatives of the Consortium at their request. According to the Proxy, "Mader and the Consortium discussed Smartsheet's business, including market trends and dynamics, [the] management team and [the] recently announced changes in [the] pricing and packaging model, and the Consortium's continued interest in pursuing an acquisition of [Smartsheet]."

73.     On June 27, 2024, the Board met with members of management and Fenwick, during which Mader updated them on his recent conversations with the Consortium. The Board thereafter discussed whether, and thereafter determined, to formally engage Qatalyst as financial advisor for a potential sale of the Company.[11] Then, the Board reviewed a three-year forecast through fiscal 2027 (the "Three Year Forecast"), which had been prepared by management in the ordinary course of business.  The Company did not include or disclose the January 2024 Forecasts, and instead only disclosed certain "Financial Projections" (discussed below) that purportedly "were consistent with the Three Year Forecast." Accordingly, it is unclear from the Proxy how the Three Year Forecast differed from the January 2024 Forecasts prepared in the ordinary course of business.

74.     At the same meeting, the Board established a Transaction Committee comprised of Gregoire, McIlwain, Rooney, and Shipchandler to "oversee" the strategic process and "to facilitate the Board['s] active involvement in [the] company's discussions and consideration of strategic alternatives, including potential negotiations with the Consortium (or any other party), but without authority to approve any transaction." The Transaction Committee purportedly "was not created to address any actual or perceived conflict of interest." As described above, Rooney had an

---

[11]     Qatalyst was formally engaged the next day.

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

extensive professional relationship with Blackstone (through Aon and Alight), and McIlwain likewise had a professional background with Vista (via his prior close connection to Apptio until its sale to Vista). The Proxy did not provide any further description of the powers and authority granted to the Transaction Committee. Clearly, however, the Transaction Committee was *not* empowered to, or chose not to, select its own legal and financial advisors.

**5.    Qatalyst Guides the Transaction Committee Toward a Quick and Limited Sales Process as the Consortium Refuses to Significantly Improve its Offer**

75.    On July 1, 2024, representatives of the Consortium informed representatives of Qatalyst that the Consortium planned to submit a revised acquisition proposal after July 4, 2024.

76.    On July 8, 2024, the Consortium submitted a non-binding indication of interest to acquire the Company for $56.50 per share in cash, subject to due diligence and the negotiation of a definitive acquisition agreement (the "July 8 Proposal"). The July 8 Proposal represented just a $0.25 per share, 0.4% increase to the Consortium's January proposal.

77.    The July 8 Proposal provided that the acquisition would be financed with a combination of equity and debt financing from third-party lenders, with a substantial portion of the equity necessary coming from the Consortium, and the remainder being funded by select co-investors to be determined later. The July 8 Proposal also indicated that the Consortium was highly confident that it could obtain the requisite debt financing commitments prior to signing a definitive transaction agreement. In addition, the July 8 Proposal provided that the Consortium expected Smartsheet to agree to negotiate with the Consortium on an exclusive basis, but that they would be willing to include a "go-shop" provision in the definitive agreement. Finally, the July 8 Proposal indicated that it was not contingent on any individual signing an employment agreement before closing.

78.    On the same day, representatives of Qatalyst discussed the July 8 Proposal with representatives of the Consortium, including among other things the Consortium's proposed sources of financing for the then-proposed transaction.

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

79.     The Transaction Committee met the next day, on July 9, with senior management, Fenwick, Qatalyst, and "other members of the Board." At this meeting, representatives of Qatalyst summarized the July 8 Proposal, the Company's stock performance, and its perspectives on the market. Qatalyst also provided a preliminary analysis of the July 8 Proposal from a financial point of view, based on the Three Year Forecast. The Transaction Committee then considered, together with representatives of Qatalyst and Fenwick, the response to the Consortium, and whether to approach other financial sponsors and strategic parties to determine their interest in pursuing an acquisition of the Company.

80.     **The Proxy** stressed the *negative* factors considered by the Transaction Committee and the net bookings metric:

> The Transaction Committee noted that since the January 24 Proposal, [the] share price had declined 6%, the multiple that [the] share price represented of [Smartsheet's] next-12 months' revenues based on analyst consensus estimates had declined 11%, **[] net bookings had continued to decline** and that analyst consensus estimates for next-12 months' revenue growth had declined from 19% to 16%. In the same period, the indexed share price and median revenue multiples of other comparable SaaS software companies had also declined. The Transaction Committee also discussed risks and opportunities [Smartsheet] faced as an independent company including (i) the risks that [] shareholders may not see the benefit of changes to [the] recently announced pricing and packaging model, or that such benefits may be delayed, (ii) the risks of successfully executing [the] recently announced go-to-market strategy, (iii) recent changes in [the] executive leadership, (iv) increasing competition from both existing competitors and entry by large, well-capitalized technology platforms, (v) the risks associated with sustained low levels of per seat spending within [the] customer base and (vi) **the implications for future revenue growth of recent trends in <u>key metrics</u> including decreasing upsell activity, increasing downsell activity and <u>declining net bookings</u>**.

81.     It is unclear whether the Transaction Committee, senior management, or "other members of the Board" considered and discussed the Company's "much better [ARR] metric," which had increased year over year, causing management to raise 2025 ARR growth guidance, or management's recent comments that the Company's stock price was "undervalued" and that "the combination of new product innovations, the upcoming launch of our modern pricing and packaging model, and a reinvigorated go-to-market strategy" had "position[ed] Smartsheet for

long-term, durable growth." **Certainly, the Proxy did not disclose any such discussion—or these facts.**

82.    Instead, **according to the Proxy**, the Transaction Committee discussed the **risks** of commencing a full process and thereafter determined to engage in limited targeted outreach to just four potential counterparties, two of which—Parties A and B—had *already* informally reached out and had prior unspecified discussions with Mader. When contacted by Qatalyst, Parties A, B, and D expressed an interest in evaluating a transaction.

83.    The Transaction Committee further directed Qatalyst to inform the Consortium members that it would not agree to any exclusivity period, but would provide the Consortium members with access to non-public financial due diligence information and access to senior management team, with the expectation that following such diligence the Consortium would provide a revised proposal on July 26, 2024.

84.    In other words, just 6 months after rejecting the Consortium's $56.25 proposal as insufficient and too low to even justify further engagement, the Board accepted the Consortium's $0.25 per share, 0.4% increase as warranting consideration.

85.    Vista, Blackstone, and Parties A and B thereafter entered into confidentiality agreements and received diligence, while Party D engaged in diligence pursuant to a previously executed confidentiality agreement.

86.    On July 16, 2024, the Transaction Committee held a meeting with senior management, Fenwick, Qatalyst, and other members of the Board. During this meeting, representatives of Qatalyst updated the Transaction Committee on the status of discussions with the Consortium and each of the other parties that it had contacted. The representatives of Qatalyst then informed the Transaction Committee that Blackstone had requested approval to provide confidential information to three of its limited partners, including Platinum Falcon, in connection with the process pursuant to the terms of the confidentiality agreements between Smartsheet and each of Blackstone and Vista. After a discussion, the Transaction Committee approved the request with respect to these three limited partners, on a non-exclusive basis, and directed senior

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

management and Qatalyst to continue engaging with the Consortium members to generate an acceptable acquisition proposal.

87. As noted above, Platinum Falcon is an affiliate of the Abu Dhabi Investment Authority ("ADIA"). A September 2024 Schedule 13D indicates that the ADIA held a currently indeterminable stake in the Company prior to July 26, 2024, and beginning on July 26, began engaging in a significant number of open-market sales and purchases of the Company's common stock. These transactions would continue until the execution of the Merger Agreement.

### 6. Leaks Lead to a Stock Price Rise and Other Acquisition Interest

88. According to the Proxy, "[o]n July 17, 2024, the closing price for shares of [Smartsheet] common stock on the NYSE was $45.34 (the 'Unaffected Price'). The next day, prior to the close of trading, [Milana Vinn of] Reuters published an article stating that [Smartsheet] had attracted acquisition interest from buyout firms." Following the article, the closing price for shares of Company common stock on July 18, 2024, was $47.81, an increase of approximately 5% over the Unaffected Price.

89. Over the next several days, senior management and Qatalyst engaged in due diligence efforts with the Consortium and other prospective counterparties, while fielding additional interest from other financial sponsors that had reached out following the Reuters article. Notably, in the context of the interactions with the Consortium, the Proxy continued to describe the Company's financial prospects in a negative context and to focus on the "net bookings" metric. By way of example only, the Proxy stated:

> On July 22, 2024, our senior management held follow-up due diligence meetings with representatives of the Consortium members relating to our products and technology and financial results. In the meeting focused on financial results, the representatives of the Consortium members asked **questions regarding headwinds the business has been facing related to the consistent deceleration of upsell bookings and increase in downsell bookings across our enterprise and SMB segments, which contributed to the year-over-year declines in net bookings** in recent periods, and our senior management responded to these questions.

90. It is unclear *how* senior management responded to those questions, including whether senior management directed the Consortium to consider the Company's "much better

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

[ARR] metric," which was a better indicator of net bookings performance. **Certainly, and again, the Proxy did not mention this "much better…metric."**

91.     The Transaction Committee's July 26 deadline for the Consortium passed without an improved offer. On July 29, the Transaction Committee met with senior management, its advisors, and other members of the Board to receive an update. Following discussion, the Transaction Committee directed management and representatives of Qatalyst to continue to engage with the Consortium with respect to a revised acquisition proposal. The Transaction Committee also considered and discussed whether to engage with any of the four additional financial sponsors that had reached out following the Reuters article, and determined to only engage with Party E and Party G, but not Party F or Party H due to the Transaction Committee's belief that such parties did not have sufficient capital to lead a transaction of this size.

92.     At the same meeting, the Transaction Committee and other members of the Board reviewed an updated long-range forecast prepared by management of the Company's financial performance as an independent company for the remainder of fiscal year 2025 and fiscal years 2026 through 2035 (the "Financial Projections"), which were purportedly consistent with the Three Year Forecast previously reviewed by the Board and provided to the Consortium and other parties. The Transaction Committee and other members of the Board approved the Financial Projections for use by Qatalyst in its financial analysis.

93.     From July 30 to August 13, the Company conducted additional due diligence with the Consortium.

94.     On August 1, 2024, Party H spoke with the Company's CFO—non-party Godbole—to reiterate its interest in a transaction and indicated that it had an investment in a competitor of Smartsheet.

95.     On August 8, 2024, the chief executive officer of a strategic party ("Party I") contacted Mader to express interest in potentially making a proposal for a business combination transaction, but did not make any proposal at that time. The Proxy did not describe whether Mader

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

informed the Board, Transaction Committee, or advisors of this overture, or otherwise further sought to timely engage with Party I.

**7.    Vista Publicly Increases Its Stake as the Consortium Submits Its Final Offer**

96.    On August 14, 2024, Vista and its affiliates publicly disclosed that, as of June 30, 2024, their position had increased from 2,122,800 shares to 6,466,672 shares, approximately 4.7% of Smartsheet's shares outstanding. According to the Proxy, "[t]his accumulation was again noted by market analysts."

97.    On August 21, 2024, the Consortium submitted a revised non-binding indication of interest to acquire Smartsheet for $56.50 per share in cash, subject to confirmatory due diligence and the negotiation of a definitive agreement (the "August 21 Proposal"). **There was no price change from the July 8 Proposal.** According to the Proxy, the Consortium indicated that the August 21 Proposal was the Consortium's "best and final offer." Despite being subject to confirmatory diligence, the August 21 Proposal stated that the Consortium had completed its business due diligence and that the Consortium was confident that it could execute a definitive merger agreement four weeks from the date it was permitted to engage prospective debt financing sources.

98.    The August 21 Proposal indicated that the acquisition would be financed with a combination of equity and debt financing from third-party lenders, with a substantial portion of the equity necessary coming from the Consortium. The August 21 Proposal also indicated that the Consortium was highly confident that it could obtain the requisite debt financing commitments prior to signing a definitive transaction agreement. The August 21 Proposal indicated that it was not contingent on any individual signing an employment agreement prior to the closing of the potential transaction. The August 21 Proposal also stated that the Consortium expected to enter into exclusive negotiations with respect to a potential transaction but, this time, did not indicate that it would be willing to include a customary "go-shop" provision in the definitive agreement.

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

**8.  As Its ARR Continues to Rise, Smartsheet Focuses on Deal Certainty with the Consortium and Executes the Merger Agreement**

99.    On August 22, 2024, two weeks following its August 8 overture to Mader, the chief executive officer of Party I spoke with representatives of Qatalyst "about the current status of the potential sale process and the feasibility of Party I making a definitive proposal." According to the Proxy, "[d]uring this discussion, the executive said Party I would not enter into a confidentiality agreement with [Smartsheet] or make a proposal to acquire [the] company at such time because it would need significantly more time to evaluate such a proposal."

100.    On August 23, 2024, the Transaction Committee met with senior management, Fenwick, Qatalyst, and other members of the Board and received an update from Qatalyst on "the outreach that it had conducted to Parties A, B, C and D, and the inbound interest that it had received following the July 18, 2024 media reports." **The Proxy did not disclose whether the Transaction Committee or Board specifically discussed Party I's interest**.

101.    The representatives of Qatalyst then discussed the terms of the August 21 Proposal, including the Consortium's request for exclusive negotiations, and reviewed a preliminary financial analysis of the August 21 Proposal, based on the Financial Projections. The Transaction Committee and representatives of Qatalyst then discussed the potential response to the Consortium. As part of this discussion, it was noted that the Consortium had indicated that the August 21 Proposal was a "best and final" offer, and therefore, it was "unlikely that a counterproposal from the Board of Directors would result in the Consortium providing a further increase in its price."

102.    After discussion, the Transaction Committee instructed Qatalyst to inform the Consortium that it would proceed on a non-exclusive basis to provide confirmatory due diligence and negotiate a definitive agreement on the terms set forth in the August 21 Proposal, provided that the definitive agreement would provide for a 45-day "go-shop" period, and the Transaction Committee authorized Qatalyst to offer that the "go-shop" could be limited to third parties with whom the Company had not entered into a confidentiality agreement with respect to a potential

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

acquisition proposal within the three-month period ending on the date of the Merger Agreement. Later that day, the Consortium agreed to proceed on these terms.

103.    On August 24, 2024, the Company approved the Consortium's outreach to certain potential debt financing sources on a non-exclusive basis.

104.    On August 27, 2024, the Board met with senior management, Fenwick, and Qatalyst and received an update on the status of negotiations with the Consortium and the Consortium's confirmatory due diligence. The Board then instructed Fenwick to prepare an initial draft of the Merger Agreement, and to contact the Consortium's legal advisors to commence negotiation of the Merger Agreement. Later that day, representatives of Fenwick held a call with Kirkland and Simpson Thacher & Bartlett LLP ("STB"), outside counsel to Blackstone, to discuss the process for negotiations of the definitive acquisition agreements.

105.    On August 30, 2024 and September 3, 2024, Smartsheet management held due diligence calls with representatives of the Consortium and their third-party advisors, and, from then through September 23, 2024, management held additional due diligence calls, responded to confirmatory due diligence requests from the Consortium and uploaded responsive documents to the virtual data room.

106.    On September 4, 2024, Mader personally met with representatives of the Consortium to discuss the due diligence process.

107.    On September 5, 2024, prior to the close of trading, a media report stated that a private equity consortium including Blackstone and Vista was engaged in discussions to acquire Smartsheet. Specifically, Milana Vinn of Reuters reported that "[a] deal could be signed in the coming weeks if the talks d[idn't] fall apart."

108.    On the same day, after the close of trading on the NYSE, the Company announced its financial results for the second quarter of fiscal 2025. Yet again, the Proxy focused on net bookings, ignoring ARR. Specifically, **according to the Proxy**:

> That day, the closing price for [Smartsheet] shares of common stock was $49.35, an increase of approximately 4% over the closing price . . . on the previous trading day. Following the close of trading, [Smartsheet] announced [its] results of

operations for the second quarter of [its]fiscal year of 2025, including subscription revenue, operating income, free cash flow, and net income above analyst consensus estimates, while delivering professional services revenue below analyst consensus estimates. [Smartsheet] lowered [its] professional services revenue guidance from 5% to 4.5% of total fiscal 2025 revenue while maintaining [its] existing full-year revenue guidance. **While second quarter 2025 year- over-year revenue growth was 17%, <u>net bookings</u> (an indicator of future revenue performance) declined 11% year-over-year.**

109.    By contrast, the Company's September 5, 2024 press release and earnings call yet again touted the ARR metric and the Company's quarterly results. Indeed, the press release did not discuss "net bookings" as "an indicator of future revenue performance" at all. Rather, the press release highlighted that "[t]otal revenue was $276.4 million, an increase of 17% year over year" while "[ARR] was $1.093 billion, an increase of 17% year over year." Mader commented that "Q2 was a strong quarter . . . with over 70 customers expanding their Smartsheet [ARR] by more than $100,000 this quarter" and that the Company had "a significant opportunity ahead to drive durable, long-term growth." In the earnings call, Mader noted that "Q2 was a strong quarter that further demonstrated [the] momentum in the enterprise," while Godbole highlighted interest from existing customers that could drive upside to ARR. Smartsheet also provided an update that, recognizing that the stock remained undervalued, it had repurchased 918,000 shares for $40 million in the quarter. **These positive performance metrics were not disclosed in the Proxy.**

110.    Following these positive earnings results, analysts again raised their price target for the Company, many to over $60 per share.

111.    **Absent from the Proxy's narrative is *any* reference to the Company's better ARR metric.** Instead, the Proxy provided a misleading characterization of the Company's performance metrics, directing stockholders to focus on the decline in *net bookings* as "an indicator of future revenue performance" rather than "much better [ARR] metric," which was a better indicator of net bookings performance, which was what the Company and management were contemporaneously telling shareholders and analysts to focus on, and which was increasing.

112.    On September 10, 2024, Party I informed Qatalyst that it would not be pursuing an acquisition of the Company at that time but would consider doing so if and when a definitive agreement with a third party was announced.

113.    Later that day, Kirkland and STB delivered proposed revisions of the Merger Agreement to Fenwick, which contemplated, among other terms, that during the go-shop period Smartsheet would not be able to solicit alternative proposals from third parties with whom it had discussed a potential acquisition proposal after March 31, 2024, whether or not it had entered into a confidentiality agreement with such parties. In other words, the Consortium sought to "reduce the ability for other potential acquirers to be able to complete diligence and provide certainty at the finish line." *See Mindbody*, 2023 Del. Ch. LEXIS 65, at *34.

114.    As the parties continued to negotiate the transaction documents, on September 13, 2024, prior to the close of trading, Bloomberg reported that Blackstone and Vista were seeking $3.2 billion in private debt to fund an acquisition of the Company. Specifically, Bloomberg reported that the private equity firms had "reached out to direct lenders for a $2.9 billion **recurring revenue loan** and a $300 million revolving credit facility."[12]

115.    On September 16, 2024, prior to the close of trading, Milana Vinn of Reuters reported that Blackstone and Vista were nearing an acquisition of the Company at a price around $56 per share (the "September 16 Article").

116.    As the parties finalized transaction documents, on September 19 the Transaction Committee received an update on the negotiations. During this meeting, Qatalyst and the Transaction Committee discussed feedback that the Company had received after the September 16 Article from a shareholder who believed that the purported sale price described in the September 16 Article was inadequate. After a discussion of this feedback, the relative benefits of the proposed transaction with the Consortium and the risks of continuing to operate as an independent company,

---

[12]    https://www.bloomberg.com/news/articles/2024-09-13/vista-blackstone-seek-3-2-billion-private-debt-for-smartsheet

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

the Transaction Committee instructed members of its senior management and representatives of Qatalyst and Fenwick to continue negotiations on the Merger Agreement and related transaction documents.

117.   On September 20, 2024, Mader met with the CEO of Party I and the parties discussed their respective businesses. The Proxy did not provide any other information.

118.   Between September 23 and 24, 2024, representatives of the Company and the Consortium finalized the transaction documents. On September 24, 2024, the Board approved the Merger Agreement and announced the then-proposed transaction prior to the opening of the NYSE market.

### 9.   The Performative Go-Shop, Shareholder Opposition, and Closing

119.   The Merger Agreement provided for a *limited* go-shop and a "No-Shop Period" such that, during the Go-Shop Period, the Company could solicit a proposal with a third-party, except any third-party "who (i) entered into a confidentiality agreement between March 31, 2024 and the date of the Merger Agreement with [Smartsheet] with respect to such third person's consideration and evaluation of any transaction with or involving Smartsheet . . .  (ii) held discussions or negotiations with Smartsheet . . . with respect to such person's consideration and evaluation of any such transaction, and (iii) received confidential information from or on behalf of Smartsheet relating to such third person's consideration and evaluation of any such transaction." In other words, any party who wished to make a competing bid would be starting from scratch, and any party that had already been interested would be excluded.

120.   The go-shop commenced on September 24, 2024. Representatives of Qatalyst reached out to 41 parties, including 23 financial sponsors and 18 strategic parties; all of the parties declined to evaluate a potential transaction. The go-shop expired on November 8, 2024, at 11:59 p.m. Pacific Time.

121.   On October 23, 2024, the Company filed a preliminary Schedule 14A proxy statement, and on November 4, 2024, the Company filed the definitive Proxy, as supplemented on November 27, 2024.

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

122.    On December 4, 2024, Alamar Capital, a long-term shareholder of Smartsheet, publicly challenged the then-proposed Merger, opining that it undervalued the Company and failed to reflect Smartsheet's true potential:

> The proposed deal, announced on September 24, 2024, offers $56.50 per share in cash for Smartsheet, a leading software maker based in Bellevue, Washington. However, in our analysis, this price significantly undervalues Smartsheet's innovative technology, market position, and future growth prospects. The price does not adequately compensate shareholders for Smartsheet's strong market position and growth potential in the collaborative work management space. Unless the buyers substantially raise the acquisition price, we believe the company should continue to trade publicly so that shareholders can participate in the company's future growth and success.

123.    On December 5, 2024, the Company announced its earnings for the third quarter of fiscal 2025, including that total revenue was $286.9 million, an increase of 17% year over year, and that **ARR was $1.133 billion, an increase of 15% year over year**. The press release did not discuss "net bookings" as "an indicator of future revenue performance" at all. Given the then-proposed merger with the Consortium, the Company did not host an earnings call and Mader did not provide any commentary on the Company's results.

124.    On December 9, 2024, based on the misleading Proxy, which focused on "net bookings" and excluded any mention whatsoever of ARR, Smartsheet shareholders approved the Merger proposal.

125.    The Merger was completed on January 22, 2025.[13]

126.    Pursuant to the terms of the Merger Agreement, Unvested Company Options, Unvested Company RSUs, and Achieved Unvested Company PSUs were converted into Converted Cash Awards, which would, subject to the holder's continued service with the surviving company, vest and become payable at the same time as the Company Equity Award from which such Converted Cash Award was converted would have vested pursuant to its terms.

---

[13]    For its part, and highlighting its profitable dynamic with Vista-involved transactions, Qatalyst received approximately $88 million from the Company in connection with the Merger, only $7 million of which was payable upon the delivery of its fairness opinion.

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

127.    Following the closing of the Merger, Mader remained the President and CEO and Godbole remained the CFO of now-private Smartsheet. On August 5, 2025, Smartsheet announced that Mader was retiring, but would remain with the Company as an "advisor and a 'significant investor.'" In connection with the closing of the Merger, Mader cashed out his vested equity awards for approximately $68 million. Upon information and belief, Mader's resignation (which occurred just seven months after the Merger closing) also triggered Mader's severance benefits, including the acceleration of unvested equity awards that had been converted into Converted Cash Awards in connection with the Merger, which the Proxy estimated to be worth approximately $15.8 million.

## C.    THE PROXY WAS MATERIALLY MISLEADING

128.    In connection with the Company's solicitation of stockholder approval of the Buyout, on November 4, 2024, the Defendants issued and filed with the SEC the false and misleading Proxy.

129.    Before signing and disseminating the Proxy solicitation, Mader had a duty under the federal securities laws to carefully read and review the Proxy before signing it, and ensure that it fully disclosed all material facts relevant to the voting decision of Smartsheet's stockholders.

130.    With respect to the Proxy solicitation, Defendants told stockholders that the Proxy "provide[d] detailed information about the Company Shareholders' Meeting, the Merger Agreement, and the Merger . . . describe[d] the actions and determinations of the Board . . . in connection with its evaluation of the Merger Agreement and the Merger" and "encourage[d] [stockholders] to read the proxy statement and its annexes, including the Merger Agreement, carefully and in their entirety, as they contain[ed] important information." The Proxy specifically instructed stockholders to look only to the Proxy and certain incorporated documents therein in deciding how to vote:

> WE HAVE NOT, AND PARENT HAS NOT, AUTHORIZED ANYONE TO PROVIDE **ANY INFORMATION OTHER THAN INFORMATION CONTAINED IN THIS PROXY STATEMENT, THE ANNEXES TO THIS PROXY STATEMENT AND THE DOCUMENTS THAT WE**

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

**INCORPORATE BY REFERENCE IN THIS PROXY STATEMENT IN VOTING ON THE MERGER**. WE HAVE NOT AUTHORIZED ANYONE TO PROVIDE YOU WITH INFORMATION THAT IS DIFFERENT FROM, OR ADDITIONAL TO, WHAT IS CONTAINED IN THIS PROXY STATEMENT. THIS PROXY STATEMENT IS DATED NOVEMBER 4, 2024. NEITHER WE NOR PARENT PROVIDES ANY ASSURANCE AS TO THE RELIABILITY OF ANY OTHER INFORMATION THAT OTHERS MAY GIVE YOU. YOU SHOULD NOT ASSUME THAT THE INFORMATION CONTAINED IN THIS PROXY STATEMENT IS ACCURATE AS OF ANY DATE OTHER THAN THAT DATE (OR AS OF AN EARLIER DATE IF SO INDICATED IN THIS PROXY STATEMENT), AND THE MAILING OF THIS PROXY STATEMENT TO SHAREHOLDERS DOES NOT CREATE ANY IMPLICATION TO THE CONTRARY. THIS PROXY STATEMENT DOES NOT CONSTITUTE A SOLICITATION OF A PROXY IN ANY JURISDICTION WHERE, OR TO OR FROM ANY PERSON TO WHOM, IT IS UNLAWFUL TO MAKE A PROXY SOLICITATION.

131.    Defendants specifically incorporated by reference into the Proxy (i) the Annual Report on Form 10-K for the fiscal year ended January 31, 2024, filed with the SEC on March 20, 2024 (including the portions of our Definitive Proxy Statement on Schedule 14A filed with the SEC on May 1, 2024 incorporated by reference therein), (ii) Quarterly Reports on Form 10-Q for the quarterly period ended April 30, 2024, filed on June 6, 2024, and for the quarterly period ended July 31, 2024, filed on September 6, 2024, and (iii) Current Reports on Form 8-K filed with the SEC on June 20, 2024, September 5, 2024, September 18, 2024, and September 24, 2024.

132.    The Proxy specifically **did not incorporate** "[i]nformation furnished under Item 2.02 or Item 7.01 of any Current Report on Form 8-K, including related exhibits." This explicit exclusion included the Company's quarterly earnings press releases and associated earnings call transcripts that described and reported the ARR metric.

133.    As described above, *every* press release published and *every* associated earnings call during the period covered by the narrative in the Proxy touted the Company's increasing ARR metric, which management, after re-evaluating its business metrics, guided the market to rely on as **the best indicator of the Company's future financial performance**. Nevertheless, despite the clear materiality of this financial metric, as discussed above, **the Proxy did not disclose this positive metric in the narrative:**

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

1      a.  June 7, 2023 quarterly results, ARR of $886 million, not disclosed;

2      b.  September 7, 2023 quarterly results, ARR of $933 million, not disclosed;

3      c.  December 7, 2023 quarterly results, ARR of $981 million, not disclosed;

4      d.  On January 17, 2024 Company announced that it reached ARR of $1 billion, a

5      "significant milestone in the [C]ompany's history," not disclosed;

6      e.  March 14, 2024 financial results, ARR of $1.031 billion, not disclosed;

7      f.  June 5, 2024 quarterly results, ARR of $1.056 billion, not disclosed;

8      g.  September 5, 2024 quarterly results, ARR of $1.093 billion, not disclosed.

9      134.  Rather, the Proxy referred to "net bookings" as "an indicator of future revenue

10 performance" three times, while referring to the "net bookings" metrics five times, but **did not**

11 **mention at all the Company's ARR, "annual recurring revenue," or "annualized recurring**

12 **revenue."**

13      135.  The Proxy used "net bookings" as "an indicator of future revenue performance" to

14 mislead shareholders in connection with their evaluation of the propriety of the events that

15 culminated in the Merger Agreement and the value of the Merger Consideration:

16      a.  In describing the Company's financial results for the fourth quarter of fiscal 2024,

17      the Proxy stated: "[w]hile fourth quarter 2024 year-over-year revenue growth was

18      21%, net bookings (an indicator of future revenue performance...) declined by 19%

19      year-over-year."

20      b.  In describing the Company's financial results for the first quarter of fiscal 2025, the

21      Proxy stated: "[w]hile first quarter 2025 year-over-year revenue growth was 20%,

22      net bookings (an indicator of future revenue performance) again declined 19% year-

23      over-year."

24      c.  In describing the Company's financial results for the second quarter of fiscal 2025,

25      the Proxy stated: "[w]hile second quarter 2025 year- over-year revenue growth was

26      17%, net bookings (an indicator of future revenue performance) declined 11% year-

27      over-year."

28

d.  In describing the deliberations of the Transaction Committee, the Proxy noted specifically the Committee's consideration that "net bookings had continued to decline" and negotiations between management and the Consortium over headwinds related to the Company's bookings.

136.    As noted above, **none of the contemporaneous earnings documents or press releases describe a "net bookings" metric. Likewise, the Company's September 6, 2024 Form 10-Q contains zero (0) references to "net bookings," but at least eighteen (18) to the ARR metric**. Indeed, a phrase search of "net bookings" within Smartsheet's EDGAR filings yielded *just*



three (3) results, **all filed in connection with the Merger**:

137.    The omission of the ARR metric is also suspicious given that the majority of the financing for the Merger was through an ARR-based loan. *See supra* ¶114 (highlighting that Bloomberg reported the debt package as the parties were finalizing transaction documents). Ultimately, Blue Owl Capital led the $3.2 billion financing package, which included a $2.9 billion ARR loan and a $300 million revolving credit facility.

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

138.    ARR loans "[are] made available and sized on the resilience and reliability of the recurring revenue of the business, with leverage measured against the ability of the borrower to service that loan from such revenue streams." *See* Matthew Ayre and Jason Larkins, *Recurring revenue-based deals*, 7 JIBFL 487 (2022) (examining transactions in the UK and European markets). "ARR financing has gained popularity amongst private equity sponsors looking to part-debt finance high growth software or similar businesses . . . [that] have not yet reached the stage at which they have achieved positive EBITDA (or if they have, the EBITDA is insufficient to support a leveraged based facility) but can demonstrate (as supported by third party diligence) predictable and identifiable recurring revenue streams from customer contracts or subscription-based services they provide." *Id.*; *see also* Christian A. Fundo, et. al., *Recurring Revenue Loans: Key Considerations for Market Participants*, THOMSON REUTERS PRAC. L. (Jun. 2023) ("The borrowers of ARR Loans are typically companies that generate significant revenue and positive cash flow, but they choose to reinvest their cash flow in sales, marketing and other customer acquisition activities in order to continue growing."). **In other words, the Company's ARR was so predictable that it formed the <u>key metric</u> used by the lenders in the Merger to finalize the debt package—yet this same metric was withheld from stockholders.**

139.    Finally, the Proxy also did not disclose the January 2024 Forecasts prepared in the ordinary course of business—and not in the midst of negotiations—thereby preventing shareholders from comparing and fully assessing the Company's financial prospects, including any changes between the two sets of projections versus the Company's actual results and guidance.

**D.    DEFENDANT MADER FAILED TO USE REASONABLE CARE IN THE FULFILLMENT OF HIS DISCLOSURE DUTIES**

140.    Defendant Mader participated in evaluating and negotiating the sale of the Company to the Consortium, signed and disseminated the Proxy solicitation in his official capacity and on behalf of the Board, and participated in the soliciting of Smartsheet shareholders to vote in favor of the Merger. As a result, Mader had a duty under the federal securities laws to read and

review the Proxy—especially those parts about which he had personal knowledge—so as not to permit Smartsheet to solicit its shareholders "by means of any proxy statement . . . containing any statement which, at the time and in the light of the circumstances under which it is made . . . omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9(a).

141.    Chapter 11 of the *Corporate Director's Handbook* (American Bar Association, 7th edition 2020) ("ABA Handbook") titled "Duties Under the Federal Securities Laws" provides important guidance to directors concerning the above disclosure duties, stating with respect to "Proxy Statements" that "[d]irectors should be attentive to the procedures followed in preparing the corporation's proxy statements. It is good practice for every director to review a reasonably close-to-final draft of the proxy statement before it is distributed or filed with the SEC, ***particularly sections dealing with matters about which the director has personal knowledge*. . .**"[14]

142.    Likewise, Chapter 4 of the ABA Handbook titled, "Risk Oversight and Compliance," states with respect to "Disclosures":

> The corporation's disclosure documents (e.g., annual reports, quarterly reports, current reports, ***proxy statements***, prospectuses, earnings releases, and investor presentations) must fairly present and ***not omit material information about the corporation and its business, financial condition, results, prospects, and risks***. Management is responsible for drafting and preparing the corporation's disclosures, and many public companies establish management disclosure committees with responsibility for preparing the corporation's SEC filings and other public financial disclosures. Although management has responsibility for a corporation's financial statements, the audit committee has oversight responsibility over all financial disclosures. In any case, the board should assure that the corporation's procedures for identifying matters requiring disclosure and preparing disclosure documents are reasonably designed to produce accurate and complete public disclosures in an appropriate and timely manner. In addition to the disclosure documents requiring their signatures, directors should be familiar with all the corporation's significant

---

[14]    *See also Dentons Public MA CLE* (October 2021) (concerning the "Background of the Merger" section of a proxy, "[b]ecause this section can be the most difficult to draft, a working draft of this section should be started by counsel early in the process and circulated for ***review by those persons most knowledgeable about the events described*** before finalizing the merger proxy statement. ***Frequently this section requires substantial input from the target company's and buyer's management, directors (in some cases), and financial and legal advisors because of the fact intensive nature of the disclosure***.").

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

disclosure documents and assure that those documents convey all material information about the business in a legally compliant and timely manner.

143.     Beyond his duty of disclosure under the federal securities laws, Defendant Mader also signed the Merger Agreement on behalf of Smartsheet in his capacity as President and CEO. Under Section 3.22 of the Merger Agreement, Smartsheet had a contractual obligation not to file a proxy "omit[ting] to state any material fact necessary in order to make the statements therein, in light of the circumstances under which they are made, not false or misleading."

144.     Further, the Board "adopted a code of business conduct and ethics that applie[d] to all of [Company] employees and officers, including [the] Chief Executive Officer, Chief Financial Officer, and other executive and senior financial officers," as well as "a code of business conduct and ethics that applie[d] to [the] directors," including Defendant Mader. Presumably, these codes of business conduct and ethics required that Mader ensure that public filings by Smartsheet like the Proxy were complete, accurate, and compliant with all applicable laws before disseminating them to shareholders.

145.     By virtue of his participation in the preparation of the Company's press releases and in the Company's quarterly earnings calls, Mader had personal knowledge concerning the Company's key ARR metric that is at the heart of this action. Thus, under federal securities laws, Mader had a duty to exercise reasonable care to read and review the Proxy before distributing it to Smartsheet shareholders—especially with respect to those parts of the narrative about which he had personal knowledge—so as to ensure that it did not contain material omissions that rendered the other statements in the Proxy materially false and misleading.

146.     Mader breached his duty as President, CEO, and member of the Board. In particular, Mader had personal knowledge of the Company's key ARR metric by virtue of his participation in each earnings call and in the preparation of each quarterly earnings press release that touted the ARR metric (and *not* the "net bookings" metric created solely for the Proxy). Mader, as a director and the Company's senior-most executive, also inferably participated in all meetings of the Board concerning the sales process and discussion of the Company's financial prospects,

including with respect to the preparation of the January 2024 Forecasts prepared in the ordinary course of business. Accordingly, Mader knew, or should have known, that the Proxy provided a materially misleading account of the Company's future financial prospects, yet did not correct the omissions or provide any tempering disclosures before the Proxy was distributed to Smartsheet's shareholders.

147.    Thus, *at a minimum*, the Defendant Mader negligently violated Section 14 and Rule 14a-9. Defendant Mader's negligence is imputed to Smartsheet. *E.g., In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015); *see also Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F.App'x 480, 485 (9th Cir. 2019).

### E.    LOSS CAUSATION: SMARTSHEET STOCKHOLDERS SUFFERED ECONOMIC LOSS AS A RESULT OF THE MATERIALLY OMISSIVE AND MISLEADING PROXY

148.    As described above, Defendants used the Proxy to mischaracterize the Company's financial success and performance during and in the context of the Company's sales process, and instead cast the Company's quarterly earnings in a negative light in the Proxy just for the purposes of soliciting approval for the Buyout.

149.    Had the Proxy been truthful and disclosed (i) that during the sales process—and in the contemporaneous earnings materials *not* incorporated into the Proxy—management specifically guided the market to focus on the Company's ARR as a better metric "closely align[ed] with [Smartsheet's] industry peers and with how management view[ed] growth in the business and evaluate[d] financial performance" and a better reflection of [Smartsheet's] quarterly net bookings performance and (ii) the *actual* ARR metrics touted to the market in each press release and quarterly earnings call, Smartsheet's stockholders would not have voted to approve the Merger at the $56.50 per share Merger Consideration.

150.    Indeed, the Merger Consideration (i) represented just a $0.25 per share increase to the Consortium's original January 24 Proposal, despite the Company's ARR successes; (ii) fell in the middle of Qatalyst's discounted cash flow analysis of $47.80 to $65.31 per share based on

admittedly "conservative" forecasts; and (iii) fell below several analysts' price targets, which had been raised following the Company's early 2024 successes.[15]

151.    And while the Proxy cited the availability of appraisal rights as one of the material factors that supported the Board's decision to approve the Merger, as a result of the materially omissive and misleading Proxy that emphasized the Company's "declining net bookings" as a material risk of Smartsheet continuing as a stand-alone company, Smartsheet shareholders were misled concerning the reasonableness of the Merger Consideration and deceived into foregoing their appraisal rights.

## CLASS ACTION ALLEGATIONS

152.    Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of herself and all other former Smartsheet shareholders (the "Class"). Excluded from the Class are Defendants and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

153.    This action is properly maintainable as a class action.

154.    The Class is so numerous that joinder of all members is impracticable. As of the record date on October 25, 2024, there were approximately 139,300,914 shares of Smartsheet's common stock issued and outstanding, and such shares were undoubtedly held by numerous individuals and entities located throughout the country. The actual number of shareholders will be ascertained through discovery.

155.    There are questions of law and fact which are common to the Class, and which predominate over questions affecting any individual Class member. The common questions include the following:

---

[15]    By way of example, prior to the Merger, UBS Group maintained a $61 per share price targets, Jefferies Financial Group and Wells Fargo maintained  price targets of $60 per share, and on September 6, 2024, Citigroup raised its price target for Smartsheet to $63 per share (from $55), Guggenheim raised its target to $62 per share (from $60), Canaccord Genuity Group raised its target to $60 per share (from $52), and BMO Capital boosted their price target to $59.00 per share (from $48).

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

a.   Whether Defendants misrepresented material information in the Proxy, in violation of Section 14(a) of the Exchange Act;

b.   Whether the Defendants violated Section 20(a) of the Exchange Act; and

c.   Whether Plaintiff and other members of the Class were harmed by the misleading Proxy;

156.   Plaintiff's claims are typical of the claims of the other members of the Class, and Plaintiff does not have any interests adverse to the Class.

157.   Plaintiff has retained competent counsel experienced in litigation of this nature and will fairly and adequately represent and protect the interests of the Class.

158.   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class.

159.   Plaintiff anticipates that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

160.   Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## COUNT I
### Against Defendants for Violations of Section 14(a) of the Exchange Act

161.   Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

162.   Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

163.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

164.    Defendants issued the Proxy and/or permitted the use of their names in the Proxy with the intention of soliciting shareholders' support for the Buyout. Defendant Mader reviewed, signed, and/or authorized the dissemination of the Proxy, which misrepresented the above-identified material information and rendered the above-identified sections of the Proxy materially false and misleading because such sections provided a false and misleading valuation picture of Smartsheet. Defendant Mader caused or allowed the Proxy to be issued with the intention of soliciting stockholder support of the Buyout, and the Proxy contained untrue statements of material fact that reasonable and diligent directors would have corrected prior to dissemination.

165.    Defendant Mader, by virtue of his roles as an officer and director of Smartsheet, was aware of Smartsheet's business, its financial projections, and its valuation information, but failed to ensure such information was disclosed in the Proxy in a non-misleading fashion, in violation of Section 14(a) and Rule 14a-9. Defendant Mader knew or should have known that the Proxy was materially false and misleading in regard to the above-referenced material information. Defendant Mader withheld material information concerning the events that culminated in the Buyout, including the "best metric" to evaluate the Company's financial prospects, and intentionally portrayed the Company's prospective financial future in a negative light.

166.    Defendant Mader also reviewed and relied upon the material information identified above in connection with his decision to approve and recommend the Buyout; indeed, as outlined above, Qatalyst reviewed and discussed its financial analyses with the Board and the Board considered those financial analyses and its fairness opinion and the assumptions made and matters

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

considered in connection therewith. Further, Defendant Mader was privy to and had knowledge of the true facts concerning the process involved in selling Smartsheet and its true value, which was greater than the value of the Merger Consideration shareholders received.

167.    Defendant Mader also knew or should have known that the material information identified above had been misrepresented in the Proxy, rendering the sections of the Proxy identified above to be materially false, misleading, and/or incomplete. Defendant Mader was required to carefully review the narrative and description of events contained in the Proxy before it was disseminated, to corroborate that there were no material misstatements or omissions. After reviewing both the underlying materials and the Proxy, Defendant Mader failed to provide a non-misleading proxy solicitation.

168.    Smartsheet is liable for violations of the Exchange Act as the issuing entity of the Proxy and based on Defendant Mader's violation of the Exchange Act.

169.    The above-referenced information that was mispresented in the Proxy was material to Plaintiff and the Class, who were deprived of their right to cast an informed vote because such misrepresentations and omissions were not corrected prior to the vote on the Merger and rendered the above-refenced sections of the Proxy materially false and misleading. The Proxy soliciting shareholders' votes was an essential link in the accomplishment of the Merger.

170.    As a direct and proximate result of the dissemination of the materially false and misleading Proxy that Defendants used to obtain shareholder approval of the Buyout, Plaintiff and the Class have suffered damages and actual economic losses (i.e., the difference between the value they received as a result of the Buyout and the true value of their shares at the time of the Buyout) in an amount to be determined at trial. By reason of the misconduct detailed herein, Defendants are liable pursuant to Section 14(a) of the Exchange Act and SEC Rule 14a-9.

## <u>COUNT II</u>
### Against the Defendant Mader for Violations of Section 20(a) of the Exchange Act

171.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

172.    Defendant Mader acted as controlling person of Smartsheet within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of his position as an officers and director of Smartsheet, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading statements contained in the Proxy filed with the SEC, Defendant Mader had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially false and misleading.

173.    Defendant Mader was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

174.    In particular, Defendant Mader had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the members of the Board to approve the Buyout and was signed by Defendant Mader on behalf of the Board. Defendant Mader thus was directly involved in preparing this document and responsible for its contents.

175.    By virtue of the foregoing, Defendant Mader has violated Section 20(a) of the Exchange Act.

176.    As set forth above, Defendant Mader had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of his position as s controlling person, Defendant Mader is liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Defendant Mader's conduct, Plaintiff and the Class have suffered damages and actual economic losses (*i.e.,* the difference between the value they received as a result of the Buyout and the true value of their shares at the time of the Buyout) in an amount to be determined at trial.

**TOWNSEND LEGAL, PLLC**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**RELIEF REQUESTED**

WHEREFORE, Plaintiff demands relief in their favor and against the Defendants jointly and severally, as follows:

1.      Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and her counsel as Class Counsel;

2.      Awarding Plaintiff and the Class damages sustained as a result of Defendants' wrongdoing, including but not limited to compensatory damages, rescissory damages, and quasi-appraisal damages, plus pre-judgment and post-judgment interest;

3.      Awarding Plaintiff and the Class the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

4.      Awarding extraordinary and/or equitable relief as permitted by law, equity, and the federal statutory provisions sued hereunder; and

5.      Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

DATED:  December 10, 2025            Respectfully submitted,

**TOWNSEND LEGAL, PLLC**

By:  /s Roger M. Townsend
        Roger M. Townsend, WSBA# 25525
        380 Winslow Way, Suite 200
        Bainbridge Island, WA 98110
        (206) 761-2480
        roger@townsendlegal.com

*Counsel for Plaintiff*

**OF COUNSEL**

**KAHN SWICK & FOTI, LLC**
Michael J. Palestina*
Brian Mears*

Gina Palermo*
1100 Poydras Street, Suite 960
New Orleans, LA 70163
Tel: (504) 455-1400
Email: Michael.Palestina@ksfcounsel.com
          Brian.Mears@ksfcounsel.com
          Gina.Palermo@ksfcounsel.com

*Pro Hac Vice forthcoming*

*Counsel for Plaintiff*